JACKSONWHITE
ATTORNEYS AT LAW
*A Professional Corporation*

40 North Center Street, Suite 200
Mesa, Arizona 85201
Telephone No.: (480) 464-1111
Facsimile No.: (480) 464-5692
Email: centraldocket@jacksonwhitelaw.com
*Attorneys for Plaintiffs*
By: Michael R. Pruitt, SBN 011792
mpruitt@jacksonwhitelaw.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Abishalom Abishalom, and Brittnie Abishalom, husband and wife,<br><br>Plaintiffs,<br>v.<br><br>Leading Healthcare Clinic of Goodyear, LLC, an Arizona limited liability company; Leading Health Managed Care, LLC, an Arizona limited liability company; Leading MDs, PLLC, n/k/a Leading MDs, LLC, during the relevant period an Arizona professional limited liability company; Dr. William Nassour and Rasha Ahmad, husband and wife; and Dr. Mohammad Nasser and Lila Ayyad, husband and wife,<br><br>Defendants. | Case No.: ___________<br><br>**COMPLAINT**<br><br>(Violations of Title VII of the Civil Rights Act; Wrongful Termination due to Whistleblowing in Violation of the Arizona Employment Protection Act, A.R.S. § 23-1501; Retaliation in Violation of the False Claims Act, 31 U.S.C. § 3730(h); Breach of the Covenant of Good Faith and Fair Dealing; and Wage Claim pursuant to A.R.S. § 23-350)<br><br>(*Jury Trial Requested*) |

Plaintiffs, Abishalom Abishalom and Brittnie Abishalom, by and through their counsel undersigned, and for their Complaint, allege as follows:

**THE PARTIES**

1. Plaintiffs Abishalom Abishalom (Mr. Abishalom) and Brittnie Abishalom (Mrs. Abishalom) are husband and wife who were at all times relevant to this action residents of Maricopa County, Arizona.

2. Defendant Leading Healthcare of Goodyear ("LHCG") is an Arizona limited liability company operating and headquartered in Maricopa County, Arizona. It operates a licensed medical facility and healthcare clinic in Goodyear, Arizona (the Goodyear Clinic).

3. Defendant Leading Health Managed Care ("LHMC") is an Arizona limited liability company operating and headquartered in Maricopa County, Arizona created to provide managed care to seniors and other individuals under a contract with Arkos Health. LHMC maintains and operates a healthcare facility and call center in Phoenix, Arizona.

4. Defendant Leading MDs, PLLC, n/k/a Leading MDs, LLC, (LMDs) during the relevant period was an Arizona professional limited liability company. On or about September 27, 2022, the business entity filed paperwork with the Arizona Corporation Commission to change from a professional limited liability company to a limited liability company. The business entity operates and is headquartered in Maricopa County, Arizona.

5. During the relevant time period, Mr. Abishalom was an employee of LHCG as defined by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*., the Arizona Employment Protection Act, A.R.S. § 23-1501, and A.R.S. § 23-350(2).

6. During some of the relevant time period, Mr. Abishalom was also an employee of LHMC as defined by the Arizona Employment Protection Act, A.R.S. § 23-1501 and A.R.S. § 23-350(2).

7. For some of the relevant time period, pursuant to an employment agreement executed on or about April 1, 2022, Mr. Abishalom was an employee of Leading MDs, PLLC serving as VP of Business Development retroactive to the date of July 1, 2021.

8. During some of the relevant time period, Plaintiff Brittnie Abishalom was an employee of LHCG as defined by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., and A.R.S. § 23-350(2).

9. During the time period relevant to this action, LHCG was an employer of Mr. Abishalom as that term is defined or used in Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*., the Arizona Employment Protection Act, A.R.S. § 23-1501, A.R.S. § 23-350(3) and the False Claims Act, 31 U.S.C. § 3721, *et seq*.

10. During some of the time period relevant to this action, LHMC was also an employer of Mr. Abishalom as defined in the Arizona Employment Protection Act, A.R.S. § 23-1501, A.R.S. § 23-350(3) and the False Claims Act, 31 U.S.C. § 3721, *et seq.*

11. During some of the relevant time period, LMDs was also an employer of Mr. Abishalom as defined in the Arizona Employment Protection Act, A.R.S. § 23-1501, A.R.S. § 23-350(3) and the False Claims Act, 31 U.S.C. § 3721, *et seq*.

12. During some of the time relevant to this action, LHCG was an employer of Plaintiff Brittnie Abishalom as defined in Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., and A.R.S. § 23-350(3).

13. Defendant Dr. William Nassour ("Dr. Nassour") is an owner operator of LHCG, a member of the limited liability company, and a resident of Maricopa County, Arizona. Dr. Nassour had the authority to act directly or indirectly in the interest of LHCG in relation to the employment of Plaintiffs Abishalom Abishalom and Brittnie Abishalom or otherwise influence the decisions of LHCG as they affected the employment of Mr. Abishalom and Mrs. Abishalom, up to and including the decision to terminate the employment of each Plaintiff.

14. Dr. Nassour is an owner operator of LHMC, a member of the limited liability company, and a resident of Maricopa County, Arizona. Dr. Nassour had the authority to act directly or indirectly in the interest of LHMC in relation to the employment of Mr. Abishalom or otherwise influence the decisions of LHMC as they affected the

employment of Mr. Abishalom, up to and including the decision to terminate his employment.

15. Upon information and belief, Defendants Dr. Nassour and Rasha Ahmad are husband and wife, and at all times relevant to these proceedings were both residents of Arizona, residing in Maricopa County, Arizona.

16. Upon information and belief, all acts alleged in this Complaint against Dr. Nassour were performed on behalf of and for the benefit of the marital community of Dr. Nassour and Rasha Ahmad, thereby rendering their marital community liable to Plaintiffs for the actions of Dr. Nassour.

17. Defendant Dr. Mohammad Nasser ("Dr. Nasser") is an owner operator of LHCG, a member of the limited liability company, and a resident of Maricopa County, Arizona. Dr. Nasser had the authority to act directly or indirectly in the interest of LHCG in relation to the employment of Plaintiffs Abishalom Abishalom and Brittnie Abishalom or otherwise influence the decisions of LHCG as they affected the employment of Mr. Abishalom and Mrs. Abishalom, up to and including the decision to terminate the employment of each Plaintiff.

18. Dr. Nasser is an owner operator of LHMC, a member and the manager of the limited liability company, and a resident of Maricopa County, Arizona. Dr. Nasser had the authority to act directly or indirectly in the interest of LHMC in relation to the employment of Mr. Abishalom or otherwise influence the decisions of LHMC as they affected the employment of Mr. Abishalom, up to and including the decision to terminate his employment.

19. Dr. Nasser is an owner operator of LMDs and a resident of Maricopa County, Arizona. During the relevant time period, Dr. Nasser was the manager of the then professional limited liability company. Dr. Nasser had the authority to act directly or indirectly in the interest of LMDs in relation to the employment of Mr. Abishalom or otherwise influence the decisions of LMDs as they affected the employment of Mr. Abishalom, up to and including the decision to terminate his employment.

20. Upon information and belief, Defendants Dr. Nasser and Lila Ayyad are husband and wife, and at all relevant times were both residents of Arizona, residing in Maricopa County, Arizona.

21. Upon information and belief, all acts alleged in this Complaint against Dr. Nasser were performed on behalf of and for the benefit of the marital community of Dr. Nasser and Lila Ayyad, thereby rendering their marital community liable to Plaintiffs for the actions of Dr. Nassour.

22. LHCG, LHMC and LMDs are business entities that act through each companies' owners, operators, members, managers, management, employees and agents.

**JURIDDICTIONAL ALLEGATIONS**

23. This action arises from the illegal actions of Defendants under various statutes of the United States including violations of Title VII of the Civil Rights Act of 1964, as amended, and the False Claims Act.

24. As this matter arises under federal statute, this Court has original and subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

25. This court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 as they form part of the same case or controversy.

26. Venue is appropriate to this court as the acts and omissions alleged herein occurred within the geographic region covered by the United States District Court for the District of Arizona.

**BACKGROUND FACTS**

27. Medicare is a federally funded health insurance program created for individuals 65 years of age or older, some younger individuals with disabilities, and individuals with end-stage renal disease.

28. Medicaid is a federally funded program that provides health coverage to many Americans, including certain low-income adults, children, pregnant women, elderly and some individuals with disabilities. Medicaid is administered by participating states

according to strict federal statutes, requirements and rules. Medicaid is funded jointly by each state and the federal government.

29. Tricare is a federal funded healthcare program for uniformed service members, retirees and their families.

30. The Arizona Health Care Cost Containment System (AHCCCS) is the name of Arizona's Medicaid program. In addition to federal funding, the program receives funding from the State of Arizona through sources such as the Joint Legislative Budget Committee and the Arizona Legislature.

31. Mercy Care is a not-for-profit health plan offering integrated care to children, adults and seniors eligible for AHCCCS benefits.

32. The Goodyear Clinic serves patients insured by Medicare, Medicaid, Tricare, AHCCCS, and Mercy Care, as well as patients who pay a portion of their medical bills and fees through private insurance providers such as Arizona Blue Cross Blue Shield, United Healthcare, Humana, CIGNA, Aetna and others.

33. LHCG operates a clinic and medical facility located in Goodyear, Arizona (the Goodyear Clinic). The City of Goodyear and the surrounding communities serve a large number of elderly and retired individuals. Accordingly, the Goodyear clinic has a high proportion of patients who pay all or part of their medical bills and fees using federal funds through Medicare and Medicaid. The Goodyear clinic also has some patients who pay all or part of their medical bills and fees using federal funds through Tricare.

34. The Goodyear clinic also has a large number of elderly, retired and low-income patients who pay all or part of their medical bills and fees using Arizona state funds through AHCCCS and Mercy Care.

35. Pursuant to federal statues, such as the Deficit Reduction Act of 2005, all Medicare and Medicaid providers, including LHCG, LHMD and LMDs, are required to ensure that all employees, management, and agents are fully educated regarding the federal and state false claims statutes, and the role these statutes play in preventing and detecting fraud and abuse in federally funded healthcare programs.

36. The state of Arizona has adopted its own Medicaid anti-fraud statute, A.R.S. § 36-2918, that is intended to prevent the submission of false and fraudulent claims to the Arizona Medicaid program.

37. On information and belief, LHCG, LHMC, LMDs, Dr. Nassour, Dr. Nasser and members of management were fully aware of the legal requirements to report and prevent false and fraudulent claims from being presented to Medicare, Medicaid, AHCCCS, and Mercy Care for payment.

38. On information and belief, the staff, employees and medical providers working at the Goodyear clinic were predominately classified as employees of LHCG or as independent contracts of LHCG.

39. At times, some of the staff, employees and medical providers of LHCG went to work at another clinic located in Peoria, Arizona (the Peoria Clinic). The Peoria Clinic was setup and operated by Leading Healthcare Clinic of Peoria, LLC. This LLC lists Dr. Nasser as its manager and LMDs as its only member.

40. In contrast to the Goodyear Clinic, the Peoria Clinic is geared more toward medical specialists, specialized medical treatment, behavioral health and serving psychiatric patients.

41. LHMC operates out of a separate facility and call center located in Phoenix, Arizona.

42. The website for LMDs[1], allows patients to make appointments with several medical providers, including Dr. Nassour and Dr. Nasser, at the Goodyear, Arizona clinic operated by LHCG. The website also allows patients to make appointment at the Peoria Cllinic.

[1] See https://leadingmds.com/ last accessed April 6, 2023.

43. The website for LMDs states that its clinics accept "all major insurance plans" including Aetna, Blue Cross Blue Shield, Cigna, Humana, Medicare, Medicaid, Tricare and United Healthcare.[2]

44. According to the LMDs website, Dr. Nassour is a medical community professional with expertise in geriatric medicine and ten years of experience in hospital medicine and outpatient care who has performed "many leadership roles as a medical director in different medical settings. He remains an active and trustworthy member of various committees in hospitals." [3]

45. According to the LMDs website, Dr. Nasser "is an experienced hospitalist and an internist providing care in different settings such as ... long-term care centers and hospitals." It also states he is well regarded for his "leadership roles." [4]

46. As an experienced leader and medical director, Dr. Nassour is very familiar with and has personal knowledge of the detailed legal and other requirements that must be fully complied with when billing Medicare, Medicaid, AHCCS, Mercy Care, Tricare and private health insurance for payment.

47. As an experienced hospitalist with a history of providing care in different settings, Dr. Nasser is very familiar with and has personal knowledge of the detailed legal and other requirements that must be fully complied with when billing Medicare, Medicaid, AHCCS, Mercy Care, Tricare and private health insurance for payment.

48. All fully licensed, certified and practicing medical doctors must comply with extensive criteria, pass a background check, formally apply in writing and be approved by a medical facility, in order to be granted privileges to perform any medical procedures or see patients at a medical office, long-term care facility, clinic or hospital in Arizona.

---

[2] See https://leadingmds.com/insusrances-accepted/ last accessed April 6, 2023.

[3] See https://leadingmds.com/doctor/dr-william-nassour/ last accessed April 6, 2023.

[4] See https://leadingmds.com/doctor/dr-mohammad-nasser/ last accessed April 6, 2023.

49. On information and belief, currently or at some point in his career, Dr. Nassour is a licensed doctor who has formally applied for and been granted privileges to see patients and conduct medical procedures at medical facilities, clinics and hospitals that include but are not limited to Integrated Premiere Group, Pam Health Rehabilitation Hospital, Abrazo Health, St. Joseph's Hospital and Medical Center and Dignity Health. As such, Dr. Nassour is well acquainted with and has personal knowledge of the mandatory requirement for first being granted privileges prior to conducting medical procedures and seeing patients at a medical facility.

50. On information and belief, currently or at some point in his career, Dr. Nasser is a licensed doctor who has formally applied for and been granted privileges to see patients and conduct medical procedures at medical facilities, clinics and hospitals that are run by or include: Integrated Premiere Group, Tempe Saint Luke's Hospital, Phoenix Internal Medicine Group, and Abrazo Health. As such, Dr. Nasser is well acquainted with and has personal knowledge of the mandatory requirement for being first granted privileges prior to conducting medical procedures and seeing patients at a medical facility.

## I. Mr. Abishalom's General Employment History with Defendants.

51. Mr. Abishalom's has an extensive background and successful career in business development and as a sales consultant. He has spent the last eight years working in the field of development and marketing for medical, hospice, and healthcare facilities.

52. While working in business development for a skilled nursing facility, Mr. Abishalom met Dr. Nassour in November 2020. The two began to socialize and discuss business opportunities. Mr. Abishalom was invited to visit the Goodyear Clinic operated by LHCG. There, Mr. Abishalom met Dr. Nasser.

53. During subsequent social interactions with the two doctors, Mr. Abishalom learned that the Goodyear Clinic was struggling. Dr. Nassour, Dr. Nasser and Mr. Abishalom discussed ways to increase patient traffic and improve business operations at the clinic. Both Dr. Nassour and Dr. Nasser expressed positive comments to Mr. Abishalom about his contributions.

54. Mr. Abishalom began to use his contacts in the hospital and retirement communities seeking to increase patient traffic at the Goodyear clinic. This unpaid consulting work of Mr. Abishalom for LHCG began in December 2020.

55. Dr. Nassour and Dr. Nasser, though LHCG, hired Mr. Abishalom in April 2021 to work as Director of Business Development for LHCG.

56. Mr. Abishalom began to work tirelessly to increase business and grow the patient count at the Goodyear clinic.

57. Based on his performance and other demonstrable results, in September 2021, Mr. Abishalom was promoted to Vice President of Business Development for LHCG.

58. During the relevant time period, Mr. Abishalom was personally responsible for significantly increasing the patient count and business of the Goodyear Clinic.

59. On April 19, 2021, LHMC was formed by Dr. Nasser and Dr. Nassour. LHMC entered into a contract with Arkos Health to provide managed care medical services. Accordingly, it became necessary for LHMC to hire staff and medical providers and open an office and medical clinic. This new office and clinic was separate and apart from the Goodyear Clinic.

60. In October 2021, while retaining his role as Vice President of Business Development for LHCG, Mr. Abishalom was hired to work concurrently as Information Technology Administrator (IT Administrator) for LHMC.

61. The duties Mr. Abishalom performed for LHMC went well beyond information technology. Mr. Abishalom was also responsible for setting up a brand new office and call center. The call center was used to conduct virtual and telehealth medical appointments.

62. During the portion of the relevant time period when Mr. Abishalom was employed by both LHCG and LHMC, he received two reduced paychecks, one from each company. His total compensation did not increase at that time.

63. Sometime on or after December 2021, LHMC hired an outside firm to take over the information technology functions. This allowed Mr. Abishalom to return primarily to his duties as Vice President of Business Development for LHCG.

64. Mr. Abishalom's last position at LHCG was Vice President of Business Development.

65. Mr. Abishalom was fully qualified for his position as Vice President of Business Development. His work performance as Vice President of Business Development was always at least satisfactory or above.

66. Mr. Abishalom's last position at LHMC was IT Administrator.

67. Mr. Abishalom was fully qualified for his position as IT Administrator. His work performance as IT Administrator was always at least satisfactory or above.

68. While serving as IT Administrator for LHMC and serving as Vice President or Director of Business Development for LHCG, Mr. Abishalom was directly supervised and reported to both Dr. Nassour and Dr. Nasser.

69. The initial compensation package for Mr. Abishalom negotiated by the Parties included an annual salary of $90,000, a $15,000 bonus for each new clinic opened, and a 5% stake in the business after meeting specific goals.

70. Due to Mr. Abishalom taking on additional responsibilities, Dr. Nassour and Dr. Nasser promised Mr. Abishalom that his annual salary would increase to $120,000. This promise was never fulfilled.

71. The annual salary component of the compensation package of Mr. Abishalom was subsequently increased to $100,000 per year sometime on or about October 2021.

**II. Mr. Abishalom endured sexual harassment, a hostile work environment, and complained about it.**

72. During his employment with LHCG, Mr. Abishalom was subjected to repeated sexual harassment and unwanted sexual comments by several female employees and members of management which created an extremely hostile work environment. The

unwelcome sexual comments continued over an extended period and generally involved the gender, sexuality, appearance, and attire of Mr. Abishalom.

73. The unwelcome comments and sexual innuendos directed at Mr. Abishalom started sometime around August 2021 and became more frequent over time. The employees made comments about his attire and physic, and they took great enjoyment in making him feel uncomfortable or embarrassed. The comments progressively became worse and involved statements about tight pants and crude euphemisms for his posterior. The sexualized comments were frequently made in front of other employees and caused Mr. Abishalom to become anxious, embarrassed, and very uncomfortable.

74. Among the female harassers of Mr. Abishalom were members of LHCG management, human resources, an office administrator at LHCG promoted to chief clinical officer at LHMC, and other employees in positions of leadership and power.

75. The comments caused embarrassment and public humiliation for Mr. Abishalom. Some of the unwelcome sexual comments included, but were not limited to:

A. On several occasions, Mr. Abishalom was asked if he was wearing his wife's pants because they were so snug.

B. Comments about Mr. Abishalom's "ass" and tight pants.

C. Female employees commenting that Mr. Abishalom must be gay because he dressed too nice to be straight.

D. Comments that Mr. Abishalom should "take your pretty self over there" and "be careful not to rip your pants."

E. One female employee made fun of Mr. Abishalom's sunglasses and implied they were for women.

F. Comments making fun of Mr. Abishalom's name by calling him "A bitch" or "Abeetch."

G. One female employee sent a text message calling Mr. Abishalom "Quajbah", which is Arabic slang for "bitch."

H. One female employee sent a group text message referring to Mr. Abishalom as "Abeetch."

I. One female employee had a habit of looking up and down Mr. Abishalom's body in an exaggerated manner when he arrived at the office.

J. Female employees openly discussing what color men they preferred.

K. Female employees openly discussed the size of men's penises.

L. Female employees openly discussed things they did with the men they were dating.

M. A comment by one female employee, "I like Arab men because they have culture, and are the perfect color."

N. A comment by one female employee, "I love my men white and German, that is what my husband is."

O. A comment by one female, "I need my men dark and tall."

P. Female employees discussing what they most liked in a man's penis size, including statements that "girth was most important" and "length was better."

Q. A female employee's comments to Mr. Abishalom about the young lady who cleaned the office having a crush on him and was his fan.

R. Comments about how nice Mr. Abishalom smelled.

S. A female employee standing uncomfortably close to Mr. Abishalom and placing her hand on his shoulder.

T. A female employee commenting on Mr. Abishalom's attire and commenting how hot it got whenever he walked into the room.

U. A female employee made racist comments about certain ethnic groups and people of color.

V. On many occasions, Dr. Nasser insinuated that Mr. Abishalom was gay due to being well manicured and the way he dressed.

76. The sexual comments directed at Mr. Abishalom were pervasive and out in the open. The perpetrators did not feel any need to hide their actions and seemed to delight in the public nature and embarrassment suffered by Mr. Abishalom.

77. Members of LHCG management and HR knew about and even heard these comments but did nothing and allowed the hostile work environment to continue and grow worse over time.

78. Mr. Abishalom reasonably believed it was pointless to formally complain about the hostile work environment and sexual comments he endured to the members of HR and management personally responsible for the worse offenses. Accordingly, in late 2021, and again in February 2022, Mr. Abishalom engaged in protected activity and complained directly to owner, operator and direct supervisor Dr. Nasser about the pervasive hostile work environment and unwanted sexual comments. He provided details and identified the worst perpetrators, including members of LHCG and LHMC management and HR.

79. Dr. Nasser promised to take care of the problem. Despite receiving detailed complaints about the hostile work environment and the unwanted sexual comments, LHCG and Dr. Nasser failed to take any effective action.

80. The hostile work environment and unwelcome sexual comments continued unabated through the date of the retaliatory termination of Mr. Abishalom on April 8, 2022.

### III. Mr. Abishalom's whistleblowing activities.

81. During his employment with LHCG, LHMC and LMDs, Mr. Abishalom engaged in whistleblowing activities and reported acts that he reasonably believed constituted violations of federal and state law.

82. Sometime on or about July or August 2021, Mr. Abishalom reported to LHCG, LHMC, LMDs, Dr. Nasser and Dr. Nassour, and discussed with members of company management, instances of double billing Medicare and Medicaid in violation of federal law.

83. Sometime on or about July or August 2021, Mr. Abishalom reported to LHCG, LHNC, LMDs, Dr. Nasser and Dr. Nassour, and discussed with members of company management, claims by LHCG presented to Medicare and Medicaid for services never rendered in violation of federal law.

84. Sometime on or about July or August 2021, Mr. Abishalom reported to LHCG, LHMC, LMDs, Dr. Nassour and Dr. Nasser, and discussed with members of company management, concerns about the use of false records and invoices presented to Medicare and Medicaid by LHCD that did not correctly name the medical professional who actually performed the medical service described in the bill in violation of federal law. LHCG knowingly used medical providers who had not been properly granted privileges at a medical facility to provide services there and then billed the services under the name of a different medical provider who did have privileges at the facility.

85. Sometime on or about July or August 2021, Mr. Abishalom reported to LHCG, LHMC, LMDs, Dr. Nasser and Dr. Nassour, and discussed with members of company management, fraud and other illegal acts on the part of LHCD involving AHCCCS and Mercy Care for such things as double billing, billing for services never rendered, and submitting billing invoices that did not correctly name the medical provider who actually performed the medical service in violation of state law.

86. Sometime on or about July or August 2021, Mr. Abishalom reported to LHCG, LMDs, Dr. Nasser and Dr. Nassour, and discussed with members of management, fraud and other illegal acts committed by LHCG involving private health insurance being double billed, billed for services never rendered, and submitting billing invoices that did not correctly name the medical provider who actually performed the medical service in violation of state law.

87. On several occasions starting sometime on or about August 2021, Mr. Abishalom reported to LHCG, LMDs, Dr. Nassour, and Dr. Nasser, a pattern of LHCG using medical providers to see patients and providing medical services without being fully

credentialed and approved to conduct medical procedures at specific healthcare facilities in violation of state law.

88. Sometime on or around December 2021, Mr. Abishalom learned of approximately 20 problematic medical visits performed by a LHCG provider at a skilled nursing facility that were supposed to be billed to federal and state funded medical insurance programs. The provider was not credentialed or otherwise authorized to perform the medical service at the facility. Mr. Abishalom raised his concerns with Dr. Nassour who confirmed with Mr. Abishalom that the provider was not credentialed to perform medical services at the skilled nursing facility, but LHCG was billing for the medical services the provider performed under Dr. Nassour's name even though Dr. Nassout did not perform the service. Mr. Abishalom made it clear to Dr. Nassour this was a serious violation of the law and that it needed to stop immediately.

89. On four or five occasions in 2021 and in March 2022, Mr. Abishalom reported to LHCG and LMDs an ongoing pattern of LHCG failing to timely contribute the mandatory employer contribution to the state unemployment insurance fund in violation of state law.

90. In a series of text messages from on or about June 18, 2021 through June 20, 2021, Mr. Abishalom was directed by Dr. Nassour to fabricate fake negative COVID test results for a family that needed to present negative COVID tests in order to travel. No COVID test had been performed. Mr. Abishalom explained his genuine concerns about this request to Dr. Nassour. The generation of fraudulent documents and medical records constitute violations of state law.

91. In or around May 2021 and December 2021, Mr. Abishalom reported to LHCG and LMDs, that LHCG was illegally allowing access to medical records in violation of the Health Insurance Portability and Accountability Act (HIPAA). Based on their training, professional history and direct knowledge, both Dr. Nassour and Dr. Nasser knew that the illegal and improper acts reported by Mr. Abishalom violated federal and state laws.

92. Many of the illegal and improper acts reported by Mr. Abishalom were reasonable attempts to remedy fraudulent, false or improper claims being presented to Medicare, Medicaid or Tricare for payment.

93. The reports of Mr. Abishalom of illegal and improper conduct were done in a reasonable manner, based on his reasonable belief that LHCG or an employee of LHCG had violated, was violating, or would violate a statute of the State of Arizona. In addition, Mr. Abishalom reasonably believed that Dr. Nassour, Dr. Nasser and other members of management were in a managerial or supervisory position with the authority to investigate and take action to prevent further violations.

**IV. The Weeks Before Mr. Abishalom's Termination of Employment**

94. Following the unjust and wrongful termination of Mr. Abishalom, Defendants have alleged that Mr. Abishalom "essentially disappeared for the last 5-6 weeks of his employment, and would not answer Dr. Nassour's texts for weeks." These allegations are demonstrably false.

95. Mr. Abishalom was always diligently working during his entire career with LHCG and timely responding to the communications of others. Some of his cell phone records document, at a minimum, the following telephone calls or voicemails involving Mr. Abishalom, Dr. Nassour, Dr. Nasser, company CEO David Selman and other members of management:

| **Date** | **Call or VM with Dr. Nassour, Dr. Nasser, or Management** |
|---|---|
| February 28, 2022 | Ms. Cole |
| March 1, 2022 | Mr. Selman, Ms. Ramirez (twice), Dr. Nassour, Dr. Nasser (twice) |
| March 2, 2022 | Ms. Cole, Ms. Dickens |
| March 3, 2022 | Mr. Selman, Ms. Cole (seven times), Ms. Dickens |
| March 4, 2022 | Ms. Cole |
| March 8, 2022 | Ms. Ramirez, Dr. Nasser |
| March 9, 2022 | Mr. Selman, Ms. Cole, Ms. Dickens (three times), Dr. Nassour, Dr. Nasser |

| | |
|---|---|
| March 10, 2022 | Mr. Selman (twice), Dr. Nasser (four times) |
| March 11, 2022 | Mr. Selman.(four times), Ms. Cole, Ms. Ramirez, Ms. Dickens (twice), Dr. Nasser (twice) |
| March 14, 2022 | Dr. Nassour |
| March 15, 2022 | Ms. Cole, Dr. Nassour |
| March 18, 2022 | Dr. Nassour (three times), LMDs Office line (eight times) |
| March 21, 2022 | LMDs Office line, Ms. Dickens, |
| March 23, 2022 | Ms. Cole |
| March 24, 2022 | Mr. Selman (twice), Ms. Dickens |
| March 29, 2022 | Mr. Selman |
| March 30, 2022 | Mr. Selman (three times) |
| March 31, 2022 | Ms. Cole |
| April 1, 2022 | Mr. Selman (three times on the date Mr. Abishalom was presented with employment contract), Ms. Cole (twice), Dr. Nassour |
| April 8, 2022 | Mr. Selman (a two minute call at 3:10 PM on the date of termination) |

96. Additional examples of Mr. Abishalom's full engagement and prompt response are found in his text messages with the Dr. Nassour, Dr. Nasser, Mr. Selman and other members of company management. Several of these text messages document Mr. Abishalom complaining about how hard it was to reach the doctors. For example:

- On March 1, 2022, Mr. Abishalom sent a text message to Dr. Nassour saying, "What's up man. Why so quite [quiet] bro." Dr. Nassour responded, "I went to Costa Rica for a week so trying to catch up. U know how it goes."
- On March 8, 2022, Mr. Selman sent a text message asking Mr. Abishalom to call him when he was free. Mr. Abishalom responded that he was on another call and would call Mr. Selman after that call. Based on telephone records, Mr. Abishalom and Mr. Selman had a telephone call the next day on March 9, 2022.
- On March 8, 2022, Mr. Abishalom sent a text message to Dr. Nassour where he reported substantial progress in adding additional patients and medical facilities. The text said, "Numbers are going up for new clinic patients. I have many facilities I'm lining up for us. 8 so far. That are 100% in For pcp and psych."
- On March 9, 2022 at 4:57 PM, Mr. Abishalom sent a text message to Dr. Nasser asking "Bro. Why are you so hard to reach man? Call me when you get a chance."

Based on telephone records, Dr. Nasser and Mr. Abishalom had a telephone call on March 10, 2022.

- On March 29, 2022, Dr. Nassour asked Mr. Abishalom, "Do u have time to come over [to] see the plan for the new clinic." Mr. Abishalom responded that he could "come in 15 minutes."
- On March 29, 2022 at 11:19 AM, Mr. Abishalom sent a text to Mr. Selman saying, "Call you right back." Based on telephone records, Mr. Selman and Mr. Abishalom had a telephone call a few minutes later at 11:35 AM.
- On March 30, 2022 at 9:43 AM, Mr. Selman sent a text message asking Mr. Abishalom to call when he was free. Based on telephone records, Mr. Selman and Mr. Abishalom had a telephone call approximately one hour later at 10:48 AM.
- On April 1, 2022, a day when Mr. Selman and Mr. Abishalom had three telephone calls, there were two text message chains exchanged between Mr. Selman and Mr. Abishalom. In the morning chain, Mr. Selman tells Mr. Abishalom, "Thanks a bunch" for earlier granting Super Admin status to the IT consulting service Visionary IT. In the afternoon chain, Mr. Abishalom states, "I forgot to ask earlier. Did it go well with the UHC [United Healthcare] contact?" He received the response from Mr. Selman, "Yes, she's helping me with Medicare Advantage contracts. Thanks again."
- On April 7, 2022 and April 8, 2022, Mr. Selman and Mr. Abishalom exchanged a text message chain that shows on April 7, 2022 Mr. Abishalom was working on a clinic brochure and planned to send to copy of the updated file to Ms. Cole. The chain also shows that on April 8, 2022 at 12:41 PM, the same day Mr. Abishalom was terminated for allegedly abandoning his job, Mr. Selman wanted to know if Mr. Abishalom was "done editing the brochure?" Mr. Abishalom immediate response was "Almost. Making a few edits. It looks too bland. I'll send it to her [Ms. Cole] now." Based on telephone records, Mr. Selman and Mr. Abishalom went on to have a two minute telephone call at 3:10 PM. As discussed below, the employment of Mr. Abishalom was terminated during this short call.

## V. Mr. Abishalom's termination.

97. Despite demonstrably false post termination allegations that Mr. Abishalom was essentially absent from his position the last five to six weeks of his employment, Mr. Abishalom was pressured into signing an employment contract only one week before his unjust and wrongful termination.

98. On Friday afternoon, April 1, 2022, Mr. Abishalom was presented with an employment agreement and asked to sign it by the end of day. Mr. Abishalom was out

marketing at that time so he signed the agreement electronically without any real opportunity to review it. When he did review the agreement, he realized that the terms failed to address the verbal assurances he had received regarding bonuses and an ownership stake in the company. Mr. Abishalom attempted to contact Dr. Nasser and Dr. Nassour to discuss the terms of the agreement without success and attempts to setup a time for a meeting proved fruitless.

99. Despite being presented to Mr. Abishalom on April 1, 2022, the agreement stated it had an "Effective Date" of July 1, 2021.

100. The agreement states that Mr. Abishalom is an employee and his employer is LEADING MDS, LLC [sic.]. At that time LMDs was a PLLC.

101. The agreement also states: "1) Commencement Date and Term. a) "The Employee [i.e., Mr. Abishalom] will commence employment with the Employer [i.e., Leading MDs, PLLC] on 07/01/2021 the ("Commencement Date"). b) Employee's direct supervisor is David Selman, Chief Executive Officer."

102. The agreement states that Mr. Abishalom is to receive "a wage at the rate of $100,000" payable every two weeks and that the Employer is entitled to deduct applicable deductions and remittances as required by law.

103. Given that the agreement states that it has an effective date of July 1, 2021, Mr. Abioshalom was never paid the full value of the compensation promised in the Employment Agreement.

104. The Employment Agreement also included various restrictive covenants in favor of the Defendants, which Mr. Abishalom had never previously signed.

105. On Friday, April 8, 2022, at 3:10 pm, just seven days after signing the Employment Agreement, Mr. Abishalom received a telephone call from David Selman, CEO for LHCG, LHMC and LMDs, during which Mr. Abishalom was informed that his employment was terminated effective immediately. When Mr. Abishalom inquired why he was being terminated, Mr. Selman promised to email a letter and provide a reason later that day. The termination letter, on LMDs letterhead, received by Mr. Abishalom stated,

[p]ursuant to Section 16 of your Employment Agreement with Leading MDs, LLC [sic.], please find this as formal notice of termination of your employment effective today, April 3, 2022."

106. Section 16 of the Employment Agreement was a provision that stated that Mr. Abishalom's employment with LMDs was at-will. The termination letter and Mr. Selman did not provide Mr. Abishalom with any reason for his termination.

107. LHCG, LMDs and Mr. Selman only terminated the employment of Mr. Abishalom after verifying earlier that morning that he had completed work on a substantive clinic brochure.

108. In a further act of retaliation against Mr. Abishalom, on April 19, 2022, some 11 days after his wrongful termination, LHCG terminated the employment of his nurse practitioner spouse, Plaintiff Brittnie Abishalom.

109. LHCG and LHMC failed to fully pay Mr. Abishalom for all of the work he performed and the accrued vacation and banked time as provided for in the Leading MDs, PLLC employment agreement.

110. Because of Mr. Abishalom's complaints concerning violations of federal and state law, Mr. Abishalom was interfered with, retaliated against, and terminated.

111. As a result of Defendants' actions, Mr. Abishalom has been damaged and continues to be damaged.

112. As a result of the illegal and retaliatory treatment by Defendants, Mr. Abishalom has suffered economic loss and other tangible and intangible damages.

## VI. Brittnie Abishalom's general employment history with LHCG.

113. Plaintiff Brittnie Abishalom is a Board-Certified Family Nurse Practitioner, licensed Registered Nurse, and has a Master's of Science Degree in nursing licensed nurse.

114. Mrs. Abishalom has worked in the medical field for approximately 12 years.

115. Mrs. Abishalom began working part-time for LHCG on December 1, 2021 as a Family Nurse Practitioner at an annual salary of $60,000.

116. Plaintiff Brittnie Abishalom's last position at LHCG was Family Nurse Practitioner.

117. Plaintiff Brittnie Abishalom was fully qualified for her position as Family Nurse Practitioner.

118. Plaintiff's work performance as Family Nurse Practitioner was always at least satisfactory or better and she received glowing customer feedback.

**VII. Brittnie Abishalom Was Retaliated Against Due to Her Husband's Title VII complaints.**

119. The direct supervisor of Mrs. Abishalom, Melissa Cole, Chief Operating Officer and Office Administrator for LHCD, was one of the members of management who aggressively sexually harassed Mr. Abishalom and created an extremely hostile work environment. In addition, Ms. Cole was one of the offenders who Mr. Abishalom reported by name to Dr. Nasser when he engaged in protected activity.

120. The indirect supervisor of Mrs. Abishalom was Director of Transitional Care, Gabby Zolnierczyk.

121. Starting sometime on or around April 2022, Brittnie Abishalom and Ms. Zolnierczyk, discussed having Mrs. Abishalom work full-time to accommodate her expanding workload and the increasing number of patients in her practice area. Ms. Zolnierczyk was enthusiastic about the proposal. Mrs. Abishalom loved her work and was excited about the opportunity to see additional patients.

122. However, after the proposal was set to move forward, Mrs. Abishalom was informed in an email from Ms. Zolnierczyk that the proposal was being retracted because Ms. Cole was responsible for making those types of decisions. In or around this same time, Mr. Abishalom was terminated.

123. Following the April 8, 2022 termination of Mr. Abishalom, the working environment of Mrs. Abishalom changed for the worse.

124. Ms. Cole became hostile and took an active role in supervising and scheduling Mrs. Abishalom. The actions of Ms. Cole targeted Mrs. Abishalom and set her up to fail.

125. Ms. Cole added unnecessary blocks in the schedule of Mrs. Abishalom where she could not be scheduled for patient visits. At other times, Ms. Cole over scheduled Mrs. Abishalom. This involved not allowing enough time for each appointment and failing to include enough travel time between appointments.

126. These preventable scheduling problems would compound during the workday and make Mrs. Abishalom sometimes late for appointments. Despite purposely causing the scheduling problems, Ms. Cole would then ask Mrs. Abishalom why she was late to her appointments.

127. On several occasions, without notifying Mrs. Abishalom, Ms. Cole scheduled her with non-English speaking patients without arranging for a professional interpreter. As a result the appointment had to be rescheduled.

128. Mrs. Abishalom discussed the situation with Ms. Cole and reminded her on several occasions that she needed ample travel time between appointments and notice of non-English speaking patients so an interpreter could be provided. Instead of correcting the problems she created, Ms. Cole inappropriately shifted the blame to Mrs. Abishalom and claimed she was sometime late or unprepared.

## VIII. Brittnie Abishalom's termination.

129. Despite providing superior care and receiving glowing customer reviews, Mrs. Abishalom's employment was terminated on April 19, 2022. The brief termination letter she received was signed by Ms. Cole in her capacity as COO for Leading MDs and provided no reason for the termination.

130. Mrs. Abishalom was fired by Ms. Cole eleven days after the termination of Mrs. Abishalom's spouse, who had engaged in protected activity and complained about a hostile work environment and the sexually harassing comments of Ms. Cole and others.

131. The termination of Mrs. Abishalom was illegal retaliation due to the protected activities and complaints of sexual harassment by her spouse.

132. Following her termination, Mrs. Abishalom informed Ms. Cole that she was not paid for all the shifts she worked. LHCG still owes wages to Mrs. Abishalom.

133. Because of Mr. Abishalom's complaints concerning ongoing sexual comments and a hostile work environment, Plaintiff Brittnie Abishalom was interfered with, retaliated against, and terminated.

134. As a result of Defendants' actions, Plaintiff Brittnie Abishalom has been damaged and continues to be damaged.

135. As a result of the illegal and retaliatory treatment by Defendants, Plaintiff Brittnie Abishalom has suffered economic loss and other tangible and intangible damages.

136. Mr. Abishalom and Mrs. Abishalom have timely filed this lawsuit and complied with all administrative requirements.

**COUNT I - Abishalom Abishalom**
**Violation of Title VII of the Civil Rights Act of 1964, as amended – Against LHCG**

137. All previous paragraphs of this Complaint are realleged as if set forth more fully herein.

138. The acts, policies, and practices of LHCG, as alleged herein above, violate Title VII of the Civil Rights Act of 1964, as amended, and created a hostile, discriminatory, and disparate work environment for Mr. Abishalom because of his sex.

139. Mr. Abishalom was subjected to a hostile work environment and repeated acts of discrimination because of his sex while employed with LHCG which were objectionable to him and which would have been objectionable to any reasonable person and which altered the work environment in such a way as to constitute a hostile work environment.

140. LHCG discriminated against Mr. Abishalom because of his sex in violation of 42 U.S.C. § 2000e-2(a) by engaging in, tolerating, or failing to prevent the

discrimination described above, by failing to take affirmative action to timely stop the unlawful employment practice, and by otherwise discriminating against Mr. Abishalom.

141. The effect of LHCG's unlawful sex harassment and discrimination has been to classify, limit, and discriminate against Mr. Abishalom in a way that jeopardizes and tends to deprive him of his employment opportunities and otherwise affect his status as an employee because of his sex, which violates Title VII of the Civil Rights Act of 1964, as amended.

142. Mr. Abishalom, a victim of LHCG's unlawful employment practices has suffered humiliation, degradation, and other non-monetary benefits solely because of his sex. Upon information and belief, Mr. Abishalom has suffered loss of income in the form of past, present, and future wages as a result of LHCG's unlawful employment practices.

143. Mr. Abishalom is entitled to recover from LHCG relief as authorized by 42 U.S.C. § 1981a and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 2000e-5(k).

**COUNT II - Abishalom Abishalom**
**Retaliation in Violation of Title VII of the Civil Rights Act of 1964, as amended – Against LHCG)**

144. All previous paragraphs of this Complaint are realleged as if set forth more fully herein.

145. Mr. Abishalom was subjected to retaliation by LHCG in direct contravention of 42 U.S.C. § 2000e-3(a).

146. LHCG retaliated against Mr. Abishalom because of his complaints about his discriminatory treatment by terminating his employment.

147. The effect of LHCG's unlawful retaliation has been to classify, limit, and discriminate against Mr. Abishalom in a way that jeopardizes and tends to deprive him of his employment opportunities and otherwise affect his status as an employee because of his protected activities, which violates Title VII of the Civil Rights Act of 1964, as amended.

148. Mr. Abishalom, a victim of LHCG's unlawful employment practices, has suffered humiliation, degradation, and other non-monetary benefits solely because of his protected activities. Upon information and belief, Mr. Abishalom has suffered a loss of income in the form of past, present, and future wages as a result of LHCG's unlawful employment practices.

149. Mr. Abishalom is entitled to recover from LHCG relief as authorized by 42 U.S.C. § 1981a and reasonable attorneys' fees and costs as authorized by 42 U.S.C. § 2000e-5(k).

**COUNT III -Brittnie Abishalom**
**Retaliation in Violation of Title VII of the Civil Rights Act of 1964, as amended – Against LHCG**

150. All previous paragraphs of this Complaint are realleged as if set forth more fully herein.

151. Title VII prohibits retaliation arising from an employee's reports of protected activities.

152. The anti-retaliation protection covers a broad range of employer conduct including employer action that might dissuade a reasonable worker from engaging in protected activity such as making a charge of discrimination or reporting a hostile work environment. A reasonable employee would be dissuaded from engaging in protected activity if the employee knew his spouse, fiancé or close family member would be fired due to his protected activity.

153. The termination of Mrs. Abishalom was an unlawful retaliatory act designed to punish Mr. Abishalom for his protected activities. As such, Mrs. Abishalom has standing to bring this claim pursuant to the anti-retaliation provisions of Title VII.

154. Mrs. Abishalom was subjected to retaliation by LHCG in violation of 42 U.S.C. § 2000e-3(a).

155. Specifically, LHCG retaliated against Mrs. Abishalom because of the complaints and protected activity of her husband, Abishalom Abishalom, related to his

hostile work environment, sexual harassment and discriminatory treatment, resulting in the termination of her employment.

156. The retaliatory termination of Mrs. Abishalom occurred in close temporal proximity to the termination of her husband.

157. The effect of LHCG's unlawful retaliation has been to classify, limit, and discriminate against Mrs. Abishalom in a way that jeopardizes and tends to deprive her of her employment opportunities and otherwise affect her status as an employee because of her husband's protected activities, which violates Title VII of the Civil Rights Act of 1964, as amended.

158. Mrs. Abishalom, a victim of LHCG's unlawful employment practices has suffered humiliation, degradation, and other non-monetary benefits because of her husband, Abishalom Abishalom's, protected activities. Upon information and belief, Mrs. Abishalom has suffered a loss of income in the form of past, present, and future wages as a result of LHCG's unlawful employment practices.

159. Mrs. Abishalom is entitled to recover from LHCG relief as authorized by 42 U.S.C. § 1981a and reasonable attorneys' fees and costs as authorized by 42 U.S.C. § 2000e-5(k).

**COUNT IV - Abishalom Abishalom**
**Whistleblower Retaliation in Violation of A.R.S. § 23-1501 - against LHCG, LHMC, LMDs, Dr. Nassour and Dr. Nasser**

160. All previous paragraphs of this Complaint are realleged as if set forth more fully herein.

161. A.R.S. § 23-1501(A)(3)(c)(ii) prohibits an employer from discharging an employee for whistleblowing activities.

162. In compliance with A.R.S. § 23-1501(A)(3)(c)(ii), Mr. Abishalom disclosed in a reasonable manner to LHCG, LHMC, LMCs, Dr. Nassour, Dr. Nasser and other members of company management, a reasonable belief that LHCG, LHMC, LMCs or an employee of these entities had violated, was violating, or would violate a statute of the State of Arizona. Mr. Abishalom reasonably believed that Dr. Nassour and Dr. Nasser

were in a managerial or supervisory position with the authority to investigate and take action to prevent further violations.

163. Mr. Abishalom's good faith disclosures and reports included, but were not necessarily limited to, such things as violations of the state insurance statutes, criminal fraud statutes, statutes related to employer contributions to the unemployment insurance fund, and the Arizona False Claims Act.

164. Among the good faith disclosures and reports made by Mr. Abishalom were reports of multiple violations of the insurance statutes found in Arizona Revised Statutes, Title 20, Chapter 2, Article 6, Unfair Practices and Frauds, as follows:

- Under A.R.S. § 20-463(A)(1)(c), it is a fraudulent practice and unlawful for a person to knowingly [p]resent, cause to be presented or prepare with the knowledge or belief that it will be presented an oral or written statement, including computer generated documents, to … an insurer, reinsurer, purported insurer or reinsurer, insurance producer or agent of a reinsurer that contains untrue statements of material fact or that fails to state any material fact with respect to any of the following …(c) A claim for payment or benefit pursuant to an insurance policy.
- Under A.R.S. § 20-463(A)(5), it is a fraudulent practice and unlawful for a person to knowingly assist, abet, solicit or conspire with another person to violate paragraph 1 of this subsection, i.e., A.R.S. § 20-463(A)(1). (See above)
- Under A.R.S. § 20-466.01, any person who violates section A.R.S. § 20-463 or § 20-463.01 with the intent to injure, defraud or deceive an insurer is guilty of a class 6 felony. (See above)

165. Among the good faith disclosures and reports made by Mr. Abishalom were reports of violations of the criminal fraud statutes found in Arizona Revised Statutes, Title 13, related to Chapter 18 Theft, Chapter 20 Forgery, and Chapter 23 Fraud, as follows:.

- Under A.R.S. § 13-1802(A)(3), a person commits theft if, without lawful authority, the person knowingly obtains services or property of another by means of any

material misrepresentation with intent to deprive the other person of such property or service.

- Under A.R.S. § 13-1802(G), if the monetary value of the theft exceeds $25,000 the person committing the theft is guilty of a class 2 felony.
- Under A.R.S. § 13-1802(H), if the monetary value of the theft exceeds $100,000 the person committing the theft must serve jail time.
- Under A.R.S. § 13-1801(B), in determining the value of the theft, the state **may** aggregate the amounts taken in theft pursuant to one scheme or course of conduct even if the amounts were taken from several persons. [Emphasis added.]
- Under A.R.S. § 13-2002(A)(1), a person commits forgery if, with intent to defraud, the person falsely makes or completes a written instrument.
- Under A.R.S. § 13-2002(A)(3), a person commits forgery if, with intent to defraud, the person offers or presents, whether accepted or not, a forged instrument or one that contains false information..
- Under A.R.S. § 12-2002(C), forgery is a class 4 felony.
- Under A.R.S. 13-2310(A), any person who, pursuant to a scheme or artifice to defraud, knowingly obtains any benefit by means of false or fraudulent pretenses, representations, promises or material omissions is guilty of a class 2 felony.
- Under A.R.S. 13-2311(A), in any matter related to the business conducted by any department or agency of the state, any person pursuant to a scheme or artifice to defraud or deceive, knowingly falsifies, conceals or covers up a material fact by any trick, scheme or device or makes or uses any false writing or document knowing such writing or document contains any false, fictitious or fraudulent statement or entry is guilty of a class 5 felony.
- Under A.R.S. § 13-2310(C), if the monetary value of the fraud exceeds $100,000 the person committing the fraud must serve jail time.

- Under A.R.S. § 13-2310(E), in determining the value of the fraud, the state **<u>shall</u>** aggregate the amounts fraudulently taken pursuant to one scheme or course of conduct even if the amounts were taken from several persons. [Emphasis added.]

166. Among the good faith disclosures and reports made by Mr. Abishalom were reports of ongoing violations of the Arizona statutes relating to unemployment insurance contributions by an employer as found in Arizona Revised Statutes, Title 23, Chapter 4, Article 5, Contributions.

- Under A.R.S § 23-749, any employing unit or any officer or agent of an employing unit or any other person who knowingly fails or refuses to make any contribution or other payment as required by this chapter … is guilty of a class 3 misdemeanor unless another classification is specifically prescribed in this chapter, and each day of such failure or refusal shall constitute a separate offense.

167. Among the good faith disclosures and reports made by Mr. Abishalom were reports of violations of the Arizona statutes relating to AHCCCS as found in Arizona Revised Statutes, Title 36, Chapter 29, Article 1, Arizona Health Care Cost Containment System.

- Under A.R.S. § 36-2918(A)(1), a person may not present or cause to be presented to this state or to a contractor a claim for a medical or other item or service that the person knows or has reason to know was not provided as claimed.
- Under A.R.S. § 36-2918(A)(2), a person may not present or cause to be presented to this state or to a contractor a claim for a medical or other item or service that the person knows or has reason to know is false or fraudulent.

168. Under A.R.S. § 23-350, *et seq.*, it is illegal for an employer to fail to pay an employee wages (commissions) for all labor or services rendered by the employee. Mr. Abishalom made good faith complaints to LHCG, Dr. Nassour, and Dr. Nasser, that he was owed wages and that LHCG's failure to pay wages earned was not justified or legal.

169. Mr. Abishalom's employment with LHCG was terminated on April 8, 2022, directly orchestrated by Defendants Dr. Nassour and Dr. Nasser.

170. As a direct and proximate result of Defendants' conduct, Mr. Abishalom has been wrongfully discharged and consequently suffered a loss of income in the form of past, present, and future earnings, along with other monetary and non-monetary benefits due him.

171. Mr. Abishalom seeks, as a result of his wrongful termination, compensatory damages incurred or to be incurred by him in an amount to be determined at trial.

172. Defendants acted with an evil mind and intentionally caused damages to Mr. Abishalom or acted with a conscious disregard of a substantial risk of harm that would result to Mr. Abishalom as a result of its actions, permitting Mr. Abishalom to recover punitive damages against Defendants.

173. Because this claim arises from an employment contractual relationship, Mr. Abishalom is entitled to recover his reasonable attorneys' fees pursuant to A.R.S. § 12-341.01.

**COUNT V – Abishalom Abishalom**
**Breach of Covenant of Good Faith and Fair Dealing – Against LHCG and LMDs**

174. All previous paragraphs of this Complaint are realleged as if set forth more fully herein.

175. There was an implied covenant of good faith and fair dealing in the employment relationship between Mr. Abishalom and LHCG. LHCG was prohibited from engaging in any actions that violated this covenant.

176. LHCG breached the implied covenant of good faith and fair dealing by, among other things, failing to pay Mr. Abishalom a $15,000 bonus due him for opening the Tempe clinic in early April 2022, failing to give him a raise to $120,000 per year for taking on additional responsibilities and meeting certain objectives, and by engaging in other actions as described herein in violation of the covenant.

177. As a result of LHCG's breach of the implied covenant of good faith and fair dealing, Mr. Abishalom has been harmed in an amount to be determined at trial.

**COUNT VI – Abishalom Abishalom**
**Breach of Contract/Wage Claim – Against LHCG**

178. All previous paragraphs of this Complaint are realleged as if set forth more fully herein.

179. There existed an employment contractual relationship by and between Mr. Abishalom and Defendant LHCG in which LHCG was contractually and statutorily required to pay Mr. Abishalom all wages due him as required by law.

180. On April 8, 2022, Mr. Abishalom's employment relationship with Defendant LHCG ended.

181. Mr. Abishalom provided Defendant LHCG with labor or services with a reasonable expectation of being paid. The compensation due to Mr. Abishalom by Defendant LHCG are "wages" as defined by A.R.S. § 23-350(7).

182. Defendant LHCG failed to pay Mr. Abishalom all wages earned by Mr. Abishalom in violation of A.R.S. § 23-351, *et seq*. Moreover, as described herein, Defendant LHCG also unreasonably delayed the payment of wages earned by Mr. Abishalom in violation of A.R.S. § 23-351, *et seq*.

183. Mr. Abishalom is owed unpaid compensation earned in a total amount to be determined at trial.

184. Mr. Abishalom is owed unpaid wages earned in a total amount to be determined at trial. These unpaid wages should have been paid by law no later than April 8, 2022 and are now due with interest.

185. Mr. Abishalom is owed for his unpaid hours of accrued vacation and banked time not used in an amount to be determined at trial. This amount should have been paid by law no later than April 8, 2022 and are now due with interest.

186. By failing to pay Mr. Abishalom all wages due him, Defendant LHCG has wrongfully violated the provisions of A.R.S. § 23-352 which prohibits an employer from withholding the payment of wages from an employee without legal authority, prior written

permission from the employee, or a claim against the employee that would be a set-off against unpaid wages.

187. Defendant LHCG does not qualify for an exemption to its obligation to timely pay wages to Mr. Abishalom.

188. Pursuant to A.R.S. § 23-355, Mr. Abishalom is entitled to recover treble the unpaid wages owed by Defendant LHCG to Mr. Abishalom.

189. For his wage claims under A.R.S. § 23-355, Mr. Abishalom is entitled to treble damages in an amount to be determined at trial.

190. Mr. Abishalom is also entitled to interest thereon at the highest legal rate provided by law until paid in full.

191. Because this is a dispute arising out of a contract, Mr. Abishalom is also entitled to his attorneys' fees and costs pursuant to A.R.S. §§ 12-341 & 12-341.01.

**COUNT VII – Brittnie Abishalom**
**Breach of Contract/Wage Claim – Against LHCG**

192. All previous paragraphs of this Complaint are realleged as if set forth more fully herein.

193. There existed an employment contractual relationship by and between Mrs. Abishalom and Defendant LHCG in which LHCG was contractually and statutorily required to pay Mrs. Abishalom all wages due her as required by law.

194. On April 19, 2022, Mrs. Abishalom's employment relationship with Defendant LHCG ended.

195. Mrs. Abishalom provided Defendant LHCG with labor or services with a reasonable expectation of being paid. The compensation due to Mrs. Abishalom by Defendant LHCG are "wages" as defined by A.R.S. § 23-350(7).

196. Defendant LHCG failed to pay Mrs. Abishalom all wages earned by Mrs. Abishalom in violation of A.R.S. § 23-351, *et seq*. Moreover, as described herein, Defendant LHCG also unreasonably delayed the payment of wages earned by Mrs. Abishalom in violation of A.R.S. § 23-351, *et seq*.

197. Mrs. Abishalom is owed unpaid compensation earned in an amount to be determined at trial.

198. Mrs. Abishalom is owed unpaid wages earned for shift work in an amount to be determined at trial. This amount which should have been paid no later than April 19, 2022 and is now due with interest.

199. By failing to pay Mrs. Abishalom all wages due her, Defendant LHCG has wrongfully violated the provisions of A.R.S. § 23-352 which prohibits an employer from withholding the payment of wages from an employee without legal authority, prior written permission from the employee, or a claim against the employee that would be a set-off against unpaid wages.

200. Defendant LHCG does not qualify for an exemption to its obligation to timely pay wages to Mrs. Abishalom.

201. Pursuant to A.R.S. § 23-355, Mrs. Abishalom is entitled to recover treble the unpaid wages owed by Defendant LHCG to Mrs. Abishalom.

202. For her wage claims under A.R.S. § 23-355, Mrs. Abishalom is entitled to treble damages in an amount to be determined at rial.

203. Mrs. Abishalom is also entitled to interest thereon at the highest legal rate provided by law until paid in full.

204. Because this is a dispute arising out of a contract, Mrs. Abishalom is also entitled to his attorneys' fees and costs pursuant to A.R.S. §§ 12-341 & 12-341.01.

**COUNT VIII – Abishalom Abishalom**
**Retaliation in Violation of the False Claims Act,**
**31 U.S.C § 3730(h) – Against LHCG, LHMC and LMDs**

205. All previous paragraphs of this Complaint are realleged as if set forth more fully herein.

206. The False Claims Act (FCA) prohibits any business or person from presenting false records or fraudulent claims for payment to the United States or covered

programs receiving federal funding. This includes medical and healthcare claims made to Medicare, Medicaid and Tricare. 31 U.S.C. § 3729.

207. The FCA provides for substantial damages and civil penalties for presenting such false or fraudulent claims. 31 U.S.C. § 3729.

208. The FCA also imposes civil liability on any person or business who knowingly uses a false record or statement for purposes of seeking payment of a Medicare, Medicaid, Tricare or other similar claim. *Id.*

209. The False Claims Act includes whistleblowing protection and provisions that make it illegal for an employer to retaliate against an employee who takes any action in furtherance of the FCA. This includes reporting, alerting or investigating what is, or might reasonably be construed to be, a false record or fraudulent claim that violates the FCA. 31 U.S.C. § 3730.

210. The FCA creates a private cause of action for any employee or agent who is discharged, or in any other manner, discriminated against in the terms and conditions of their employment due to reports, acts or investigations that might reasonably lead to a *qui tam* action or some other effort to stop or remedy a violation of the FCA. 31 U.S.C. § 3730(h).

211. As described herein, Mr. Abishalom reported to LHCG, LMDs, Dr. Nassour, Dr. Nasser and members of LHCG and LMDs management the use of knowingly false records to obtain payment of medical and health related claims through Medicare, Medicaid and Tricare. Such reports constitute protected activity that might reasonably lead to a *qui tam* or other action pursuant to the FCA

212. As described herein, Mr. Abishalom reported to LHCG, LMDs, Dr. Nassour, Dr. Nasser and members of LHCG and LMD management the use of false or fraudulent claims that involved such things as double billing of medical and health related claims through Medicare, Medicaid and Tricare. Such reports constitute protected activity that might reasonably lead to a *qui tam* or other action pursuant to the FCA.

213. These reports were made in an effort to stop real or potential violations of the FCA.

214. The reports and protected activity of Mr. Abishalom were based on his direct and independent knowledge and not through any public disclosure.

215. As described herein, LHCG and LMDs as the employer of Mr. Abishalom, knew that he engaged in protected activity under the FCA.

216. As described herein, Dr. Nassour and Dr. Nasser, as the owner operators of LHCG and LMDs and as supervisors of Mr. Abishalom, knew that he engaged in protected activity under the FCA.

217. As a direct result of his protected activity under the FCA, LHCG and LMDs terminated the employment of Mr. Abishalom.

218. As a direct result of the retaliatory termination, Mr. Abishalom has suffered significant economic loss, emotional damages and other tangible and intangible damages.

*219.* Under the anti-retaliation provisions of the FCA, Mr. Abishalom is entitled to recover all relief necessary to make him whole. 31 U.S.C. § 3730(h). This includes but is not necessarily limited to, all economic and non-economic harm, damages for his emotional distress due to his retaliatory termination, harm to reputation, reinstatement or front pay in lieu thereof, double his back pay damages, interest on his back pay damages, all compensatory damages, all special damages, all litigations costs and his reasonable attorneys' fees and costs. *Id.*

220. Mr. Abishalom is also entitled to a reasonable tax gross-up to compensate him for the tax implications of a lump sum award thereby putting him in the same positions he would have been if he had earned the compensation and wages over time at a lower tax rate.

**WHEREFORE**, Plaintiffs request that this court enter judgment in their favor and against the Defendants as follows:

A. Declare that the employment practices complained of in this Complaint are unlawful and that they violate 42 U.S.C. §§ 2000e-(2)a and 2000e-3(a);

B. Enter an injunction prohibiting actions in the future that violate federal laws;

C. Award Mr. Abishalom his unpaid earned wages with prejudgment interest accruing on April 8, 2022;

D. Award Mr. Abishalom for his unpaid hours of unused vacation and banked time with prejudgment interest accruing on April 8, 2022;

E. Award Mrs. Abishalom her unpaid earned wages with prejudgment interest accruing on April 19, 2022;

F. Award Mr. Abishalom treble damages under A.R.S. § 23-355 for his unpaid wages;

G. Award Mrs. Abishalom treble damages under A.R.S. § 23-355 for her unpaid wages;

H. Order Defendants to pay Plaintiffs' actual damages in an amount to be proven at trial;

I. Order Defendants to pay Plaintiffs their economic and non-economic damages and losses including lost wages, back pay, front pay, and other monetary and non-monetary benefits, all amounts to be proven at trial;

J. Order Defendants to make Mr. Abishalom whole with all relief available under Mr. Abishalom's claim in violation of A.R.S. § 23-1501, *et seq*., including full back pay, front pay, and reimbursement for all lost monetary and non-monetary benefits, all to be proven at trial;

K. Order Defendants to pay Plaintiffs' actual damages in an amount to be proven at trial for all of their claims;

L. Order Defendants to pay Plaintiffs' general and compensatory damages for their economic losses, pain and suffering, emotional distress, harm to reputation and loss of earning capacity, and all special damages or financial losses that Plaintiffs have suffered in an amount to be proven at trial;

M. Order Defendants to pay Plaintiffs for loss of fringe benefits in an amount that will be proven at trial;

N. Order Defendants to pay Plaintiffs punitive or exemplary damages;

O. For additional damages to compensate for the taxation of Plaintiff's economic damages.

P. Award Plaintiffs prejudgment interest from the date each claim for damages was liquidated;

Q. Award Plaintiffs prejudgment interest on all liquidated sums and interest on all sums awarded in judgment at the highest legal rate allowable from the date of judgment until paid;

R. Award Plaintiffs interest on all sums awarded in judgment at the highest legal rate allowable from the date of judgment until paid;

S. Order Defendants to pay Plaintiffs' court costs, expenses, and reasonable attorneys' fees in connection with this action, as provided in A.R.S. §§ 12-341 and 341.01, and any other applicable statutes;

T. Order Defendants to provide for a reasonable tax gross-up of any compensation or wage award to compensate Plaintiffs for the tax implications of a lump sum award thereby putting them in the same positions they would have been if they had earned the compensation and wages over time at a lower tax rate.

U. For Plaintiffs' continuing costs in this matter;

V. That this Court retain jurisdiction over this action to ensure full compliance with the Court's orders; and

W. For such other and further relief as this court deems just and proper.

**DATED** this 7th day of April, 2023.

**JACKSON WHITE**

/s/ Michael R. Pruitt
By: Michael R. Pruitt, SBN 011792
40 North Center Street, Suite 200
Mesa, Arizona 85201
*Attorneys for Plaintiffs*